**TWIN CITY SPORTSERVICE, INC.,**
**a Missouri corporation, Plaintiff,**

v.

**CHARLES O. FINLEY & COMPANY, INC., an Illinois corporation; and Charles O. Finley, an Individual, Defendants.**

**CHARLES O. FINLEY & COMPANY, INC., an Illinois corporation, Counter-Claimant,**

v.

**TWIN CITY SPORTSERVICE, INC., a Missouri corporation; and Sportservice Corporation, a New York corporation, Counter-Defendants.**

Civ. No. 48234 TCC.

United States District Court,
N. D. California.

Sept. 29, 1972.

As Amended Oct. 17, 1972.

---

33. 473 F.2d at 573 (concurring opinion).

Frederick P. Furth, John H. Boone, Thomas J. Gundlach, Geoffrey P. Knudsen, San Francisco, Cal., for plaintiff and counter-defendants.

Law Offices of Rothschild, Barry & Myers, William G. Myers, Alan L. Unikel, Chicago, Ill., Stark, Simon & Sparrowe, Stanley E. Sparrowe, Oakland, Cal., for defendants and counter-claimant.

## AMENDED MEMORANDUM OF DECISION FINDINGS OF FACT AND AND CONCLUSIONS OF LAW

MR. JUSTICE CLARK*:

This case was originally filed as a diversity action for the alleged breach of a concession contract and damages arising therefrom. Originally the contract was between Penn Sportservice, Inc. of Pennsylvania (PENN), a predecessor in interest of the plaintiff Twin City Sportservice, Inc. (TWIN CITY), and Connie Mack's American League Baseball Club of Philadelphia (PHILADELPHIA ATHLETICS). It was dated September 25, 1950, called for a 15-year term and provided that its terms were to be "unaffected by change of ownership." Penn paid the Philadelphia Athletics $150,000 cash, $100,000 for existing concession equipment, an agreement to loan $100,000 and to pay 29 percent on the gross receipts from a limited menu of concession items sold to spectators at all events, including home games of the Philadelphia Athletics, at Shibe Park. Two years later the contract was amended releasing the Philadelphia Athletics from repayment of the $100,000 previously paid for the existing concession equipment at the end of the term and providing that Penn make certain concession improvements. The term of the contract was enlarged to 25 years (a ten-year increase).

In 1954 the Philadelphia Athletics came under new ownership (Johnson) and were moved to Kansas City, Missouri, becoming the "Kansas City Athletics." In order to reduce the term of a lease held on Shibe Park, the 1950 contract was extended an additional 8 years and the concession followed the team to Kansas City under a "follow the franchise" claim.[1]

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

1. "Follow the Franchise" agreements provide that if the baseball franchise is moved to another facility, the concession contract goes with it.

In 1961 the defendant Charles O. Finley & Company, Inc. (FINLEY), acquired the Kansas City Athletics and, after the 1967 season, moved the team to Oakland, California, where it assumed the name of "Oakland Athletics." Finley took the position that it was not bound by the 1950 contract which still had 16 years of its term remaining. It began negotiating with Coliseum, Inc., the Oakland stadium authorities, regarding concession matters when this suit was filed. Twin City (successor to Penn) contends that Finley is bound by the 1950 contract until expiration on January 1, 1984. On application of Twin City, Judge Peckham issued a temporary injunction enjoining Finley from entering into any contract which would prejudice the rights of Twin City, subject to the final decision in this case. Since that time, conditioned as directed by the Court, Volume Service, a concessionaire of Seattle, Washington, has been performing at home games of the Oakland Athletics pursuant to its 1966 contract with Coliseum, Inc.

Subsequently, Finley filed a cross-action in this suit and impleaded Sportservice Corporation, a New York corporation (SPORTSERVICE)[2] and parent of Twin City, asserting that if Finley was bound by the 1950 contract—which it denied—that the contract violated the Federal antitrust laws. Finley also asserted a damage claim. On February 14, 1969, Judge Peckham ordered the case bifurcated and set the contract issue for trial, withholding the antitrust claim until after the contract issue was determined. In June, 1970, the case was assigned to the writer pursuant to his designation to sit in the Northern District. On August 24, 1970, the contract issue came on for hearing before the Court without a jury and testimony was heard for a week. On September 11, 1970, the Court found that there was an understanding that the concession contract would follow the franchise prior to Finley's purchase of the Athletics or, in any event, that Finley had ratified such an understanding and was now estopped from denying it.

During the hearing on the contract issue, the parties also developed from the witnesses appearing, facts concerning the anti-trust issue, and Finley offered some additional exhibits on its antitrust counterclaim and rested subject to proving up its damages. Twin City had requested an adjournment before going into the trial on the antitrust issue because of a previous setting of a protracted case in another Federal Court in which its attorneys were involved. In order to save the delay as well as the necessity of a further hearing, the Court suggested that Sportservice file offers of proof regarding its antitrust defenses, which was subsequently done. Under the offers the Court tentatively decided that the 1950 contract violated the Federal antitrust laws. However, after a hearing the Court at the request of Sportservice, on May 24, 1971, reopened the case for the hearing of further testimony. Sportservice took over 20 depositions, after which the trial was resumed on September 13, 1971. Unfortunately, the death of Mr. Justice Black and previous commitments brought about an adjournment on September 25 until October 22, after which the trial was concluded. Evidence had been received for 28 full trial days with almost 6000 pages of transcript and in excess of 800 exhibits. Subsequently, voluminous briefs, suggested findings, et cetera (all totalling over 500 pages) were filed and the case was taken under submission on February 1, 1972.[3]

### 1. Jurisdiction and Commerce:

There is no contest over jurisdiction, the parties acknowledging that the con-

2. When referring to Sportservice hereafter, all of the Sportservice is included, unless otherwise indicated.

3. Delay in preparing this opinion and findings has been occasioned by prior commitments made by the writer to sit in the various Courts of Appeals in anticipation that this case would be concluded in the Fall of 1971.

tract issue lies under 28 U.S.C. § 1332 and the antitrust ones are under 15 U.S.C. § 15 and § 22; and Sportservice concedes that the commerce involved in this suit is interstate commerce.

### 2. *The Parties and Their Respective Businesses*:

(a) Sportservice is engaged nationally in the sale of concession services for sporting events, et cetera, including the sale of food, refreshments, beverages, novelties and, in some instances, advertising, program printing, et cetera, at baseball, football, basketball, hockey, dog and horse racing and other spectator sporting events. The business originated with three brothers, Marvin, Louis and Charles Jacobs, and was known as Jacobs Brothers. It was originally limited to the sale of popcorn, et cetera, at the Academy Theater in Buffalo, New York where the brothers lived. However, it expanded to other cities and turned to baseball to gain an outlet during the summer when theaters were closed because of the hot weather. Their first baseball concession was in New Jersey, but by 1919 they were operating also in Buffalo and Baltimore. In 1930 they sold their first "big league" club, the Detroit Tigers, and in 1939 were successful in securing the concession at the Washington National Airport. In the early 1940's they expanded their business into racetracks and indoor sports arenas. At the close of World War II, Jacobs Brothers served some 100 minor league baseball clubs, three major ones (Detroit, Pittsburgh and Cincinnati), three indoor facilities and one racetrack. They then began their expansion into major league baseball. By 1961, out of a total of 15 clubs using outside services, Sportservice had ten of them; in 1971 it had ten [4] clubs out of twenty-two American and National League franchises that use outside concessionaires. The terms of the contracts vary from ten years (Washington, D. C.) to a possible 100 years (Pittsburgh). In addition, Sportservice serves approximately 84 contracts at other sport facilities.[5]

In 1948 the brothers incorporated Sportservice Corporation which succeeded Jacobs Brothers. Originally the stock was distributed in equal shares between the brothers, but subsequently Louis Jacobs obtained the interest of Marvin and Charles and became the sole owner. Each of the concession contracts is serviced by a separate corporation—of which there are about one hundred—and they are owned or controlled by Sportservice Corporation which in turn is controlled by Emprise Corporation (EMPRISE) which for operating purposes serves as the parent corporation. Emprise owns the stock of Sportservice except for 5 percent which is in the Louis Jacobs estate. In addition to being the overall holding company for the system, Emprise also makes loans to baseball franchise owners, as well as other owners or operators of sports operations or facilities.

As has been indicated, the Sportservice system's concession contracts are serviced at spectator events in stadiums, arenas, racetracks (horse and dog), convention halls, auditoriums, theaters, airports, snack bars, airline-in-flight feeding and major expressway restaurants. The annual sales of the system exceed $103,000,000 annually, on which its profit is around 10 percent. Its baseball concessions run somewhat higher profits of 13 percent of aggregate gross sales. While it is disputed, there is also testimony that the Sportservice system is the largest concessionaire in the spectator events field in this country, if not in the world. Beyond question, it operates in

---

4. Two of the ten are in litigation: Pittsburgh and Oakland [involved here].

5. It has had an ownership interest in an indoor arena, a fronton, a group of bowling alleys, eight dog tracks, twenty three horse race tracks, a basketball team; and a part interest in the following concessionaires: Race track Concessions, Inc., Far West Recreations, B & L Concessions and Gladieux Corporation.

more major league baseball parks, sports arenas and buildings and racetracks than any of its competitors.

(b) Finley is a comparative newcomer to the baseball world. It became the owner in 1961 of the old Connie Mack franchise of the American League of Professional Baseball Clubs, known as the Philadelphia Athletics. The purchase was after the Philadelphia Athletics had been moved to Kansas City and had become the Kansas City Athletics. At the time, the Sportservice system was performing under the 1950 contract with Connie Mack and continued to do so until Finley moved the team to Oakland. This was the basis upon which the Court found that Finley was estopped from denying not only the 1950 contract but also that the "follow the franchise" agreement was part and parcel of it.

3. *The Relevant Market*:

(a) There is no dispute with regard to the geographical market being national. The difference comes with regard to the line of commerce. Sportservice contends that the relevant market should include "the exchange of concession franchises for the sale of a limited menu of concession items, to spectators in a closed area, either by vendors, by stands or both, where the preparation requires at most a grill and not a kitchen." It would include in the relevant market the supplying of concession services to 1250 arenas-auditoriums, 850 stadiums, 623 horse racing tracks and 35 dog racing tracks. It then concludes that since Sportservice has the concession service at 24 arenas-auditoriums, 12 stadiums, 13 dog tracks and 45 horse racing tracks, it has about 4 percent of the relevant market. Finley, on the other hand, says that the supplying of concession services at major league baseball games constitutes the relevant market or submarket. As most everyone knows, major league baseball consists of two leagues, i. e., the American League of Professional Baseball Clubs and the National League of Professional Baseball

Clubs. Since 1969 there have been 12 baseball teams or clubs in each league; from 1962–1968 there were ten; prior to that each league had 8 teams, except for one year, 1961, when the American had 10 teams. Prior to 1961 each team played 154 games per season; commencing in 1962 each team has played 162 games. Half of the games scheduled are played at home. No two teams in the same league play their home games in the same city. At certain times one ball park was used for the home games of both the American and National League Clubs located in Philadelphia and St. Louis.

Concession items at major league baseball parks consist of scorecards, novelties, hot dogs, peanuts, popcorn, beer, soft drinks, ice cream and other snack items. They are sold before, during and after the staging of major league games. In two instances the home baseball teams handle the concessions themselves, but the remaining ones contract it out to a professional concessionaire. The transaction calls for the furnishing of services by the concessionaire to the team or ball park owner in which the former has the exclusive right to sell concession items at the home games of the ball club. The average annual sales at the major league baseball parks under concession contract is approximately two million dollars.

(b) The cases of the Supreme Court teach us that a service market is subject to the Sherman Act just as is a product one. United States v. Grinnell Corporation, 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1963); that the relevant market selected must reflect "commercial realities," Id. at 572, 86 S. Ct. 1698; that there may be submarkets that are separate economic entities, Id. at 572, 86 S.Ct. 1698; that there is no reason to differentiate between "line" of commerce in the context of the Clayton Act and "part" of commerce under the Sherman Act, Id. at 573, 86 S.Ct. 1698; that there are substitutes for various types of services but they must operate at the same level to meet the inter-

changeability test of *DuPont*, (United States v. E. I. DuPont etc.) 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, Id. 384 U.S. at 573, 86 S.Ct. 1698; that where there are "marked differences, not the low degree of differentiation required of substitute services" a distinct, separate market or submarket is present. Id. 384 U.S. at 573, 86 S.Ct. 1698. *Grinnell* also says that even though competition is present from other modes of service—though the degree there was seriously overstated—prices cannot always be controlled "due to fringe competition." But what must not be overlooked is "that the high degree of differentiation (between the markets) for many customers . . ." is the decisive factor. Id. at 574, 86 S.Ct. at 1706. The Court approved the accredited central station service alarm system as the only one that would do for many customers and was, therefore, a relevant market.

And in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L. Ed.2d 510 (1962), the Court found the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." At 325, 82 S.Ct. at 1523. It found three relevant lines of commerce: men's, women's and children's shoes.

Still another case apposite here is International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L. Ed.2d 270 (1959), where the Court chose the promotion of championship boxing contests as the relevant market. In so doing, the Court carved out all of the other professional boxing events. International insisted that the "physical identity of the products . . . would seem necessarily to put them in one and the same market." (The same argument that Sportservice makes here). But the Court found that the market varied with the part of commerce under consideration. And in appraising the revenue, the television and movie rights, the Nielsen Ratings, the public demand, the price of the tickets, et cetera, said that other professional boxing was not reasonably interchangeable with the championship fights.

In United States v. DuPont, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the Court again carved out automobile finishes and fabrics as a separate, identifiable market having "sufficient peculiar characteristics and uses to constitute them products sufficiently distinct from all other finishes and fabrics to make them a [relevant market]." In a number of earlier cases the Court found small segments of an industry's products as constituting "a relevant competitive market." United States v. Columbia Steel Co., 334 U.S. 495, 68 S. Ct. 1107, 92 L.Ed. 1533 (1948) ("rolled steel"); United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) ("First run" movies) [6]; Fashion Originators' Guild v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) ("original design" dresses). The Courts of Appeals have likewise been discriminating. Judge Learned Hand in United States v. Aluminum Company, 148 F.2d 416 (2 Cir. 1945) ("virgin" aluminum); Crown Zellerbach Corporation v. F. T. C., 296 F.2d 800 (9 Cir. 1961) (Census coarse paper); Case-Swayne Co., Inc. v. Sunkist Growers, Inc., 369 F.2d 449 (9 Cir. 1967) (product of orange).

■ (c) The supplying of concession services to major league baseball has so many "marked differences" when compared with those furnished other sports or enterprises that it encompasses a separate, distinct and unique market. Indeed, "the commercial realities" of ma-

---

6. The court found the "first-run field, which constitutes the cream of the exhibition business, is the core of the present cases. Section 1 of the Sherman Act outlaws unreasonable restraints irrespective of the amount of trade or commerce involved . . . and § 2 condemns monopoly of 'any part' of trade or commerce." At 172–173, 68 S.Ct. at 936.

jor league baseball concessions creates a relevant market of its own:

(1) The concession contract covers 80 or more "home" games for each team (more than any other sport) and the longest "season" each year; the per team annual spectator attendance is larger than any other sport; it enjoys the highest per capita concession revenues and produces the highest total concession revenues and profits of all sports; it has more TV and radio coverage than any sport, and has "top billing" in the news media [7]; and it has the highest confidence of the public—prestige-wise—more than other sports.

(2) Major league baseball is the "prime tenant" in the stadia where it is played. It thereby affords exclusive rights to its concessionaire to all events being staged in its stadia. If baseball owns the stadiums, it always retains or extends to its concessionaire exclusive rights to serve all events at the stadiums, i. e., Los Angeles, Boston, Chicago (both National and American Leagues). Where baseball is the tenant, it customarily designates the concessionaire for all events staged in the stadiums and invariably selects its own, i. e., Seattle, Milwaukee, Baltimore, Montreal, Cincinnati, Minnesota, Atlanta, Houston and New York (both National and American Leagues). And in other instances in actual practice, baseball is given a veto over the selection of the concessionaire, i. e., Cleveland, Philadelphia, Kansas City, Anaheim, San Diego and St. Louis. In 1970, of the 24 stadiums where major

league baseball was played, nineteen also staged professional football and in every case the same concessionaire serviced all events, including football, pursuant to a contract with the baseball management, or the stadium owner; and in no case did the concessionaire operate under a contract with a football or other team, except baseball.[8] Only major league baseball receives revenue from other events staged where it plays. This gives its concessionaires the cream of the concession business, including not only baseball and football but all other events staged in the stadiums where major league baseball is played. This unique situation places the baseball concessionaire in a completely separate economic entity and a unique and isolated relevant market or submarket of the concession business.

(3) Another "marked difference" that the baseball concession enjoys is the "follow the franchise" clause now included in at least seven major baseball concession contracts. It is in five Sportservice contracts and two others (New York Yankees and San Diego, Canteen having the Yanks and Servomation the other). The record here includes 77 concession contracts outside of baseball and not one has such a clause. Sportservice suspects that the clause is used outside of baseball also but it has not found any evidence of it after all these years of litigation. This clause has imbedded Sportservice into the baseball concession business. In at least three instances the clause has been utilized by

---

7. Professional football enjoys equal coverage but its season is much shorter.

8. It may be said that this occurs because it would be both uneconomical and impractical to have two concessionaires in the same stadium, arena, etc. because it would require the equipment etc. to be moved in and out of a stadium to serve 8 or 10 football games annually or other events that may come to the stadium from time to time and that, since the baseball concession serves 80 games, it takes over. But the reason is not so simple. For example, when Sportservice went to Kansas City with the 1950 Philadelphia Athletics contract it took over the football concession

after football moved to the stadium; likewise Stevens took over the San Francisco 49'ers because of its baseball concession. And Oakland, with four major league tenants in the stadium, gives baseball alone participation in the concession revenue of the stadium. At Atlanta the baseball tenant receives concession revenue from all events at the stadium and in Washington, D. C., the baseball team received part of the football concession revenue as well as that from baseball. It is no answer to these commercial realities to say it is coincidence. Why does the football concessionaire never take over the other concessions when its team moves?

Sportservice, i. e., Seattle to Milwaukee, St. Louis to Baltimore and in this case.

(4) Sportservice contends that baseball and football concession services are practically identical, and they are alike in "kind." However there are "marked differences" in "degree," as one Sportservice employee testified when he characterized them as "completely different types of operations." See International Boxing Club v. United States, supra, 358 U.S. at 251, 79 S.Ct. 245. Football relies largely for concession sales on the half-time inactivity but it is watered down by the half-time entertainment on the playing field. Baseball, in contrast, has 17 built-in "coffee breaks" in a 9-inning game, plus the "seventh inning stretch," now universal. Additional pauses come when pitchers are relieved, which is becoming more frequent. These differences are reflected in the standard concession bidding formulae which give baseball 80 percent weight. In every major league baseball city, except Oakland, the per capita revenues are higher in baseball. In addition, major league baseball plays ten times more home games on the average than professional football. While, as Sportservice emphasizes, the lowest earning baseball concession is below that of the highest earning football concession, the fact is that the average major league baseball concession earns about twice as much as the average professional football concession. Take the contract of the Houston Astrodome: Its concession contract provides that if for some reason the baseball team moves from the stadium, the guaranteed annual minimum return to the Astrodome is reduced from one million to one hundred and fifty thousand dollars.

(5) The differences between the major league baseball concessions and others become staggering from a standpoint of the capital necessary to secure the contract. In major league baseball the average is about $700,000 while horse-racing is less than $200,000, buildings (arenas) less than $70,000 and dog tracks less than $60,000. This does not take into account the so-called "cost of contract," advances, loans, et cetera.

The total (cash, improved or new concession facilities, loans, et cetera) ran as high in major league baseball as $2,500,000 (Milwaukee); $2,000,000 (Atlanta, Montreal, Seattle); $1,500,000 (San Diego, Philadelphia, Anaheim, N. Y. Mets); $1,000,000 (Detroit, N. Y. Yankees, Houston, Cincinnati, St. Louis); $500,000 (Pittsburgh, Atlanta, Los Angeles Dodgers, Chicago $450,000).[9] While some large loans have been made outside of baseball, they have been infrequent. No other sport has consistently experienced such a record of such high expenditures on loans, etc. with such long term contracts. Moreover, I have combed the record carefully and have found no direct payments to any football teams.

(6) The "marked differences" between major league baseball concession services and those of arenas-stadiums, buildings, dog and horse racing tracks, et cetera, are many. As to the latter, investment, "cost of contract," et cetera, and income is much less. In addition, in actual operation, horseracing and dog tracks having a much less restricted menu, selling entire dinners, et cetera, as well as liquor. Indeed, Sportservice concedes that the restaurants at these facilities should not be in the relevant market. Nor do these facilities have vendors or hawkers. Personnel is not shifted between baseball stadiums and racetracks, dog tracks, arenas, et cetera, because of differences in operation. The number of spectators is much smaller. The concessionaire does not handle the same package of advertising, score cards, sketch books, novelties, et cetera, as do the baseball ones. In addition, special skills are needed in baseball to accurately estimate attendance, et cetera. Furthermore, the major league

9. Investments, costs of contracts, advances, loans etc. of less aggregate amount than $450,000 are not listed.

baseball concessionaire must handle all events staged in the stadium, including football, rodeos, et cetera. The staff must be more capably trained, carefully selected because of large sums of money involved, et cetera, and paid a higher compensation. Baseball also has a different type or class of spectators. It has more youngsters, ladies and "regulars" than the other sports and, not serving liquor, must develop higher volumes of sales in other products. Mr. Dillon put it well in his testimony:

"Staffing, organization, manning of that organization, accounting for large sums of money, controls to avoid shortages, you just do not apply a multiplier to a small operation, believe it or not, and expect the fellow who runs the small operation to supply that multiplier and go ahead and do it. In the first place he does not have the ability, he has not got the experience. Men who operate large stadiums are executives, they are good executives. This is not true of men who operate small minor league stadiums."

■ Sportservice would include 1250 arenas-auditoriums, 850 stadiums, 623 horseracing tracks and 35 dog tracks in the relevant market. The record indicates that the typical stadium is open 38 days each year, conducts 18 types of events and the average annual attendance is 125,000; the annual revenue from concessions—where available—is an average of 20 cents per capita. The typical auditorium-arena is on a larger scale but as to concessions produces less than 20 cents per capita. Major league baseball produces as much as $1.93 per capita with an average of $1.00 to $1.25 while professional football runs from 85 cents to 95 cents per capita. As to the horserace tracks, Sportservice says that in 1970 its 45 tracks took in 1½ times as much revenue as did its 8 major league baseball concessions (two Sportservice baseball concessions are in litigation, Pittsburgh and Oakland). This means that on the average, each of Sportservice's major league baseball concessions took in four times as much revenue as each horse track. Based on these statistics furnished by Sportservice, one average day's concession receipts at a major league baseball club would produce as much revenue as a whole year in the average stadium; and even horse racing, which Sportservice says produces its highest per capita revenues, requires four racetracks to equal one ball park. Still Sportservice would give these 1250 arenas-auditoriums, 850 stadiums and 623 horse tracks equal weight with major league baseball concessions. The realities of commercial life just do not operate in this fashion. The average percentage of gross revenue paid on non-baseball concession contracts is 23 percent while major league baseball runs 33 percent. The foundation of Sportservice's success as a concessionaire has been bottomed on major league baseball concessions. It is living proof that major league baseball occupies a unique, distinct and separate market. As International Boxing Club v. United States, *supra,* reminds us, the determination of a relevant market "involves distinctions in degree as well as distinctions in kind." At 251, 79 S.Ct. at 251.

Still Sportservice insists that the kind of products, the kind of equipment and the kind of personnel used in an auditorium-arena, a horse or dog track or a stadium concession can readily be interchanged with a major league baseball one.[10] However there is no evidence of any interchange of concession contracts or of cross-elasticity of demand or supply; nor is there any evidence that such a switch would be commercially profitable or economical. Corwin D. Edwards, noted economist, advises us: "The growing use and misuse of the economic concept of the relevant market is a glaring example of infelicitous borrowing . . . Economists worth their salt also realize that, on the supply side of the market, there is a cross-elasticity of

10. The testimony is conflicting. On personnel all agree that prior experience in baseball concessions is preferable.

supply—that under appropriate incentives the seller may be capable of substituting alternative goods for his present goods, and that the substitutability of goods in the productive process also helps to determine the boundary of the market. The capacity . . . varies with numerous characteristics of the productive process and of the cost structure, as well as with the financing and the contractual arrangements associated therewith, and consequently there are successive gradations in the capacity of the producer to offer alternatives." There is no evidence of any willingness of a concessionaire to trade a major league baseball concession for any other or for a cluster of others; nor is there evidence of a club owner trading his share for a non-baseball concession share. It is only the Sportservice economist who says that it can be done.[11] In so doing, the economist and Sportservice overlook the testimony of those in the concession business for years, and, in addition, they ignore the commands of *International Boxing Club, supra,* that we must consider "distinctions in degree." The latter are overwhelming. The realities of the concession business show that long before the products, the equipment and the personnel can be interchanged—if they ever could be; and there is evidence to the contrary—a concession contract must be secured. In major league baseball this requires an investment alone that averages $700,000, with the "cost of contract," loans, advances, et cetera, on top of investment that runs the total cost up from one million to three million dollars.[12] On the contrary, the record shows that the average investment in

horseracing concessions is about $200,000 and it is the highest outside of baseball. The record also shows that concessionaire after concessionaire did its best to break into major league baseball concessions but never made it—unless they had a million or two to put up.[13] Sportservice's expert says that the necessary funds can be borrowed on the concession contract. The evidence is that in the "commercial realities" of banking that cannot be done. Some witnesses told of their efforts to do so and failed. Over the years Sportservice has been the "deep pocket" and it has exacted its toll. The money is not available in normal channels.

Bill Veeck, one of baseball's most colorful and perennial baseball club buyers (with Sportservice putting up the cash) called major league baseball "the best concession sport in the business"; and Arnold Weiss, longtime house counsel for Sportservice added: Major league baseball is "unique, its ownership is unique, its games are unique, it plays its home games in a unique location, its patrons are unique, and an agreement to perform concession services for a major league baseball team is unique. There is a limited, distinct and unique demand for such services and a limited number of customers thereof." Mr. Weiss is right—the concession business of which he speaks is a "limited, distinct and unique" market. I find that major league baseball concessions is the relevant market here.

4. *The Policies and Practices of Sportservice:*

As has been indicated, Sportservice has followed practices in the major

---

11. Sportservice depends heavily upon the testimony of Professor William S. Comanor of Stanford University as to the relevant market, the competitive effect of long term contracts and the tying arrangement issue.

12. The Sportservice contracts in non-baseball facilities are also burdened with some "cost of contract", loans etc. and long terms ranging from ten to sixty years; contract extensions are also present that are similar to baseball.

13. Volume Service was able to secure the Oakland contract from a public authority. It is most unusual in the face of the litigation, but was awarded before baseball came to Oakland. All other concessionaires that have broken into the major league baseball concession business in the last decade have bought their way in and they are few and far between. In 1971 Sportservice still had ten major league contracts tied up.

league baseball concession business that are indicative of anticompetitive policies. The record is filled with such activity which began to surface soon after World War II. At that time Sportservice had concession contracts with three indoor facilities, one horserace track, 100 (approximately) minor league baseball concession contracts, three major league ones and no dog tracks. The minor leagues were in their decline and Sportservice was anxious to improve its position. It then adopted a policy of aggrandizement toward major league baseball concessions. Its plan was to secure long-term contracts, by making advances, loans, investments, pay-offs. The longest term, at that time, of its concession contracts in the record was five years (Pittsburgh) which was made in 1944; and there is no evidence that it made advances, loans, et cetera, prior to that time. Sportservice secured the following concession contracts in major league baseball on the terms and at the times noted:

(1) *Chicago White Sox, 1945*: The first contract was obtained under the new policy. It contemplated a $308,000 maximum investment and carried a term sufficient to amortize that amount at the rate of $10,000 a year—potentially some 31 years. There followed a series of contracts:

(2) *Cleveland, 1946*: A loan to Bill Veeck [14] of $150,000 by the Morris Plan Bank but guaranteed by Louis Jacobs, as part of the purchase of the Cleveland team, brought an advertising, score card, et cetera, concession to Sportservice for a period of 15 years with automatic renewal so long as the team remained.

(3) *Pittsburgh, 1946*: Sportservice already had the concession but Frank McKinney with his silent partner, Louis Jacobs of Sportservice, bought control of the team (Jacobs put up $330,000). After McKinney took over the management, he needed cash to make improvements. In October, 1946, a five-year extension of the 1944 contract was made with Sportservice, providing for 20 percent of the gross sales for the club. Sportservice agreed to make unspecified expenditures for "various improvements in the refreshment department . . . with the understanding that our present agreement is after December 31, 1955, to be automatically extended for such further yearly periods as are required to amortize such further expenditures made by us at the rate of $5,000 a year." The amount of expenditures and, therefore, the number of years was not specified, but the agreement made reference to "at least twenty-five years." McKinney testified that he did not contemplate that the contract would be extended in perpetuity. Prior to selling his and Jacobs' silent interest in 1950, McKinney signed a letter to Sportservice, agreeing that the expenditures up to that time were $254,617.23 which would extend the contract for 51 years. Sportservice now claims expenditure of over $500,000 entitling it to a 100-year extension.

(4) *St. Louis Browns, 1948*: $150,000 loan, purchase of $125,000 equipment; 10 year contract which the club could terminate at the end of 1952 or any subsequent year.

(5) *Detroit (Renewal), 1949*: No payment, loan, advance, etc.; one year term.

(6) *Cincinnati, 1950, (Renewal)*: $100,000 investment; 5-year contract.

(7) *Philadelphia, 1950*: Connie Mack and his family had controlled the Athletics since 1902. They were in serious financial trouble. The Athletics owned Shibe Park and the concessions were handled by Mack's son, including both the Athletics and the Phillies baseball clubs. Sportservice had been trying to get the Athletics concession—the only one in the United States that serviced teams from both leagues at the same ball park. On September 25, 1950,

14. "Veeck—As in Wreck" by Bill Veeck and Ed Linn. G. E. Putnam & Sons, 1962, relates some of the bizarre circumstances of this acquisition. PP. 85–95.

Sportservice entered into a 15-year contract with the Athletics and paid the club $150,000 cash, gave a commitment for a loan not exceeding $100,000 and purchased the concession equipment at Shibe Park for an additional $100,000. The Athletics agreed to repurchase the equipment at the end of the contract term for $100,000 but a contract provision allowed the club to escape this obligation by permitting a 10-year extension of the term. The contract provided for a 29 percent share of the gross receipts for the club. Two years later the contract term was extended to 25 years in consideration of the cancellation of the concession equipment repurchase agreement and the renewal of the $100,000 loan commitment. In 1954 the Athletics were sold to Arnold Johnson who moved the Athletics to Kansas City. The Sportservice concession contract went with the club under its "unaffected by change of ownership" clause. However, it continued in effect as to all other events at Shibe Park, including the Phillies. Mr. Johnson then sold Shibe Park to Robert Carpenter, the owner of the Phillies, who required that the Sportservice contract insofar as it bound Shibe Park be reduced by 8 years. Sportservice required this 8 years to be added to the Athletics' contract term, extending it to a total of 33 years.

(8) *St. Louis Browns, 1951*: Another Veeck transaction in which Louis Jacobs loaned $175,000 to Veeck on condition that within 15 days after buying his part interest in the Browns he would deliver to Sportservice "an exclusive concession agreement satisfactory to (Jacobs) or holder of this note, covering Mission Stadium in San Antonio, Texas, and Sportsmen's Park in St. Louis, Missouri." Sportservice already had a concession with St. Louis. See (4) *supra*. When Veeck got control of the team, the old St. Louis concession contract was cancelled, effective December 31, 1952,[15] a new contract provided for ten years with an option for 15 years additional, the "follow the franchise" clause was clarified, the stadium owners joined in the contract binding its assigns and a clause undertaking to extend the contract to the Cardinals was added. This latter undertaking was accomplished[16] which gave Sportservice 9 major league baseball concessions. At this time Stevens had 4 major league concessions, and the remaining three performed their own.

Veeck moved the Browns to Baltimore[17] in 1953, and Sportservice went with them under its "follow the franchise" clause. It remains in effect until 1977. In the move Sportservice picked up the Baltimore Colts football team pursuant to the custom heretofore mentioned.

(9) *Cincinnati, 1955 (Renewal)*: $25,000 cash and a $50,000 investment; 5 year contract.

(10) *Detroit, 1956*: $500,000 cash, 15-year contract with right in Detroit to terminate after ten years upon payment of $200,000 ($40,000 a year for remaining term).

(11) *Cleveland, 1960*: On competitive bidding for a ten-year contract.

(12) *Washington, D.C. 1961*: Competitive bidding for a ten-year term.

(13) *Los Angeles Angels, 1961*: One-year contract, no payoff, advances, loan, et cetera. Sportservice received reimbursement of its costs, plus rental on its equipment plus 5 percent of gross sales. This gave Sportservice ten of the fifteen major league teams receiving profession-

---

15. By agreement of the parties, the 1948 contract was superseded and cancelled effective December 31, 1952, which was 1½ years later. By post dating the effective date of the new agreement to January 1, 1953, this additional 1½ years was added to its term of 25 years [including the option]. The right to cancel which was in the old agreement was eliminated in the new one.

16. The Cardinals did not capitulate but bought Sportsmen's Park and were caught by the Sportservice contract with the Browns to which Sportsmen's Park was a party.

17. The American League would not permit Veeck to remain with the team in Baltimore.

al concession services. (Three teams— Chicago Cubs, Minnesota and Milwaukee provided their own concessions).

(14) *Chicago White Sox, 1961*: This is Veeck's third deal with Louis Jacobs. $150,000 loan from Jacobs, Sportservice or Emprise with a new concession contract to Sportservice. $200,000 to Chicago *or* $200,000 spent on improvements which became property of Chicago; percentage raised to 30½ percent (Cleveland received 33 percent in 1960 as did Washington D. C. in 1961); follow the franchise clause inserted. After the concession contract was signed, Veeck sold out.

(15) *St. Louis, 1965*: Contract for 30-year term, with $400,000 minimum annual guarantee; $1,400,000 spent on improvements. Only nationally operating concessionaires with financial capacity to make guarantee and expenditure were considered by St. Louis; "the concessionaire would have to be satisfactory to our main tenant, namely The Cardinals Baseball Team" (whom Sportservice then served). However, Sportservice is protected on its guarantee by built-in extensions of the term of the contract if the annual guarantee is not fully earned. This continued Sportservice's hold on the major league baseball concession services. (Three clubs continued to handle their own service). In 1966 Milwaukee moved to Atlanta and employed ARA's services; and, in 1967, the Phillies' portion of the old Athletics contract of 1950 expired and they awarded the concession to ARA, which left Sportservice with 9 teams out of the 18 serviced by concessionaires. In 1969 four new teams were added to the Leagues. Sportservice obtained two, Montreal and Seattle, which gave them exactly 50 percent of all of the major league baseball concession contracts.

(16) *Montreal, 1969*: $2,000,000 loan (Sportservice had to borrow the money itself at 9 percent interest and loan it to Montreal for 3½ percent); 25 year term at 33⅓ percent. Montreal negotiated with several concessionaires; Restaurant Associates "could not justify the economics of such a loan"; ARA likewise declined. Ogden's Executive Committee offered only a guarantee which Montreal's bank refused. Montreal's McHale, believing Sportservice to be the only company that "would be able to immediately help us" called Sportservice and made the deal by telephone. Sportservice made the funds available that day. Montreal had never played a game of baseball and Canada had never had a major league baseball club; the stadium would only seat 2,000 people but was being expanded to 28,000. But the "follow the franchise" clause is in the contract, and Montreal is building a new stadium. There may be a clash between the City and Sportservice as to honoring the "follow the franchise" clause. McHale depended on baseball being the prime tenant, and the parties had no doubt as to which way the city would go. It wants the ball club.

(17) *Seattle, 1969*: $2,000,000 loan, interest ½ percent over prime 25-year term at 32 percent; $75,000 investment in the temporary stadium and $1 to $1½ million in the proposed new one; and a "follow the franchise" clause. Initially Seattle requested $4 million in loans. Volume Service could not meet the requirements; Restaurant Associates found the loan request "completely unfair"; Canteen had reluctance to get into the investment phase; Ogden met with Seattle 15 to 20 times. The loan phase of the requirements was reduced to $2 million in October, 1968, but Ogden refused; Servomation followed somewhat the same course. Sportservice was the only one left and it "came through." Soon after the Montreal contract was completed, Sportservice contacted Seattle and one or two telephone conversations preceded the final contract in February, 1969. It included commitments that Seattle would not sign a lease for the new stadium unless Sportservice came along as concessionaire, which was no more than what its contract provided.

(18) *Cincinnati revisited, 1969*: Not less than $1,000,000 investment; 15-year

term with subsequent agreement to extend to 25 years. Riverfront Stadium in Cincinnati is municipally owned with a lease to the baseball team under which the latter operates the concessions. The team decided to employ a professional concessionaire. The team originally desired a 5 to 10-year concession, but the concessionaires persuaded them to increase it to 15 years. Three concessionaires bid. Sportservice received the contract on the second highest bid. The expenditures Sportservice was obligated to make were "not less than a million dollars." They ran higher. In addition, an electrical power controversy arose before the stadium was completed, and the baseball team asked Sportservice to pay the difference in cost which was nominal, i. e., some $60,000 if done by a certain date. Sportservice indicated it might pay the difference if the term of the contract was extended to 25 years. While the Cincinnati Executive Committee thought "¼ of a century" was long, it agreed to it. Sportservice's final investment commitment was $1,650,000.

(19) *Milwaukee, 1970*: After the Seattle Club took bankruptcy, the team moved to Milwaukee and Sportservice went along under the "follow the franchise" clause. Sportservice had committed itself to a $3 million loan to the ultimate purchaser of the franchise (assumption of the $2 million Seattle loan and an additional $1 million). The additional million was to include the parking and advertising during the term of the concession. When Milwaukee could not secure the parking, the loan was reduced to $500,000. When it came to evicting Ogden—who had a contract on the stadium where the transferred team was to play—the County had to pay Ogden $280,000, to which Sportservice contributed. This gave Sportservice 25 years at Milwaukee with both the major league baseball team and the Green Bay Packers, which went with it.

(20) *Detroit, 1970*: A $500,000 loan without interest produced a one year extension, effective 1972, with the option in the ball club to renew for 9 additional years. However, if it does exercise its option to renew by October, 1972, Sportservice would make another $500,000 payment and the Club would be entitled to retain an extra 4 percent of gross concession receipts, retroactive to January 1, 1970, the latter being payable October 15, 1972. This would be 4 percent for three full seasons, 1970, 1971 and 1972. On past experience the 4 percent would amount to $400,000 and with the $500,000 cash, payment would total $900,000.

(21) *Chicago, 1970*: $100,000 cash, a loan of $350,000 and a commitment to invest another $100,000; 10 year contract. Sportservice's old contract made by Veeck was to expire December 31, 1970. Sportservice contacted Chicago on September 10, 1970, for a renewal. On September 15 Chicago decided to circulate specifications for the concession to ARA and Canteen. The specifications called for a cash payment of $150,000 and a loan of $250,000. Chicago had scheduled a lunch with Canteen on September 16th. Sportservice called by telephone in the morning of the 16th and was told of the specifications. A deal was made on the telephone for a cash payment of $100,000 and a loan of $350,000. The luncheon with Canteen was cancelled. Thus Sportservice will maintain its exclusive rights with Chicago from 1945 to 1980 while the team has never received a competitive bid. The last extension occurred during a recess of this case and five days after the Court had decided the 1950 contract was binding on Finley, if not in violation of the antitrust laws.

5. *The Restrictive Effects of the Contracts*:

Various tests of the usefulness or restrictive effects of long-term contracts are laid down in Standard Oil Co. v. United States, 337 U.S. 293, 308, 69 S. Ct. 1051, 93 L.Ed. 1371 (1949). Among them are: Has competition flourished despite the restraints; the conformity of the length of their term to the reasonable requirements of the field

of commerce in which they were used; the status of the user as a struggling newcomer or an established competitor; and the degree of market control of the user "for the greater the dominance of his position, the stronger the inference that an important factor in attaining and maintaining that position has been the use of . . . contracts to stifle competition rather than to serve legitimate economic needs." At 308, 69 S.Ct. at 1059.

(a) At the time this suit went to trial, Sportservice had 50 percent of the relevant market in long-term contracts with no term less than 10 years. The reasonable requirements of the concession business do not necessitate such long contracts. The length of the Sportservice contract does not vary in proportion to the size of the investment; recoupment varied from $5,000 to $110,000 annually and length of term was without regard thereto. The long terms served to restrain the market and protect Sportservice's monopolistic position therein. Sportservice always took all that it could and gave only what it must to land the contract. Indeed, the experience of competitors of Sportservice shows that adequate recoupment can be made over much shorter periods (Yankee Stadium, $1,251,000, term 10 years; Anaheim, $1,500,000, 10 years; Houston, $1,200,000, 3–10 years (ARA) and $850,000 on a year-to-year basis (Ogden); Los Angeles $650,000 for 10 years; Kansas City, $385,000, 4 years and Milwaukee $175,000, 3 years). Sportservice itself amortizes its investments, et cetera, over a 7-year tax period.

Moreover, it appears inappropriate to include the cash advances, loans, et cetera, in these tabulations. They are not a legitimate expense. Sportservice since 1950 has included its outright cash payments as "cost of contract" in its accounting system. Mr. Zander, Vice-President of Sportservice, testified that "cost of contract" occurred whenever Sportservice secures a concession contract from a club that owns the facilities

at its ball park. It is, he said, simply paying rent for a customer's concession facilities. But examination of each contract shows this is not correct. For example, Mr. Mack (Philadelphia Athletics) owned the concession facilities and sold them to Sportservice. In its books Sportservice entered the $150,000 it paid Mack in cash as a "cost of contract." It owned the facilities itself. The same is true of the Chicago, Detroit and Cincinnati stadiums where Sportservice had paid for the concession facilities. Rather than "cost of contract" it is a payoff, as in Veeck's transactions, to get the contract. Finally, the degree of market control that Sportservice enjoys creates a strong inference that the long contracts have been an important factor in its success. It is true that Sportservice did not obtain the concession contracts in Atlanta and Houston, but that was because Sportservice had taught its competitors to follow its lead if they wished to break into the market. They only raised the payoff. As *Standard Oil, supra,* points out, the competitors were "struggling newcomers," even though rich ones.

Sportservice also seeks to justify its action by asserting that it was the Clubs that sought long terms. With possibly one exception (St. Louis in 1965) this is not supported in the evidence. Where the Clubs seek enormous sums of money by way of advances, loans, et cetera, they know that such financial arrangements require long terms. However, the record shows the Clubs do not want long terms. Absent the loans, advances, et cetera, all of the terms are comparatively short. Indeed, Sportservice took one for a single year.

The Eastern District of Pennsylvania explained the impact of long term contracts in United States v. Pullman Co., 50 F.Supp. 123 (1943), in these words (at 129):

"As a competition killer the long term contract is an effective weapon. One could hardly have a more favored service contract than an agreement for exclusive dealing, equipment of

one's own choosing and a quarter of a century of time to elapse before one need to be concerned with new terms. Even a patentee is not so secure against a passage of time. Multiply the advantage by the number of railroads with whom Pullman secured service contracts and its position, for the years covered, was impregnable."

This case was cited with approval in *Standard Oil, supra,* 337 U.S. 293 at 308, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). In fact, long term exclusive contracts have been found to be *per se* violations of Section 3 of the Clayton Act, *Standard Oil, supra,* and Section 5 of the Federal Trade Commission Act, FTC v. Motion Picture Advertising Service Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), if they foreclose a substantial share of the relevant market. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

The vices of these contracts need not be belabored. They foreclose competitors for a significant period of years; tie the parties to the contract and prevent them from bettering their position; they beget extensions just as Sportservice has obtained here, thus eliminating further competition. There is nothing theoretical about this. Many concessionaries, this record shows, have been forced to eschew competition in the relevant market despite their qualifications. Long-term contracts also harm the baseball club. After the Phillies broke away from Sportservice they were able to get a 37 percent contract instead of 29 percent.

Furthermore, as is indicated in the contracts listed in *Paragraph 4, supra,* they often have provisions which serve to extend and enlarge the term and coverage of the original contract. For example, when Sportservice is called upon to guarantee a minimum payment, the contract is extended where such payments are made and not earned. Likewise, the monies Sportservice expends on the improvement of facilities, such as the Pittsburgh contract, are amortized

at differing rates and extend the contract beyond its stated term. Finally, the St. Louis Cardinals were brought under a Sportservice contract because the owner of the stadium it was purchasing had obligated the stadium to Sportservice at the latter's instance.

(b) The evidence also shows that Sportservice's economic power in the relevant market was not obtained by normal expansion, superior management or an enterprising sales force. In fact, practically all of its contracts were obtained "by deliberate, calculated purchase for control," United States v. Reading Co., 253 U.S. 26, 57, 40 S.Ct. 425, 432, 64 L.Ed. 760 (1920). The use of its large financial resources enabled it to get the unusual contracts it secured. Indeed, the few contracts it obtained without using its financial muscle were of short term (1 to 10 years) and had none of the earmarks of its purchased contracts. The evidence shows conclusively that its use of financial resources was with intent to secure long term contracts at lower rates and thus restrain, attempt to monopolize and to monopolize the relevant market. Sportservice has made these payments, advances, loans and other financial arrangements not as a banking or financing business, but solely to its concession customers on the absolute condition that Sportservice obtain concession contracts for long terms and at low rates. While concession services and financial accommodations are separate products for antitrust purposes, Sportservice has for a quarter of a century employed its great resources to reduce the ability of other concessionaires to complete in the relevant market and to secure for itself long term, low rate contracts. Its success reveals sufficient power to require major league baseball clubs to purchase its concession services over an excessively long period of time as a condition to securing its financial assistance. This power gives Sportservice unique economic advantages over its competitors by creating artificial barriers to entrance into the relevant market and has unreasona-

bly restrained competition therein—all of which with the specific intent to monopolize that market. As a result, all of the smaller competitors have been excluded, except at public facilities. Likewise, baseball has been harmed because once the club becomes indebted to the concessionaire the quality and performance of the services deteriorates. Moreover, the club is often stuck with the bad contract while an owner like Veeck moves on to greener parks.

(c) The "follow the franchise" provision also acts as a restraint as well as a mechanism to enforce the long term contracts. Wherever the team goes the concession follows; and usually—as in Milwaukee—the transfer also includes all other events staged at the stadium to which the baseball franchise is moved. This is not only unfair to the club but severely restricts competition and supports Sportservice's attempt to monopolize.

Sportservice says the advance or loan is given without strings, but this is hardly acceptable. In the rare cases where the loan, the cash and the concession are not locked together, they were received with the understanding that best efforts would be exerted to repay the favor. Sportservice also says that this practice is not a barrier to entry into the market unless the capital requirement is $500,000,000. The evidence is to the contrary. Sportservice assumes the concessionaire can borrow the necessary cash from a bank or other loan agency on the concession contract. This is just bunk or pure naiveté. Finally, Sportservice says that the cash and loans are but reflective of a "two-part pricing structure." But it matters not what one labels them, they have unlawful anti-competitive effects and are indicative of a specific intent to violate Section 2 of the Sherman Act. Furthermore, that label is inaccurate where the benefit accrues to someone other than the team.

Finally, Sportservice says that "everybody is doing it." But even so, this does not give Sportservice immunity.

United States v. National City Lines, 186 F.2d 562 (7 Cir. 1951), cert. denied, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351. Moreover, no competitor has come close to Sportservice's record. There is no evidence that any of the following concessionaires—all competitors of Sportservice—ever made a cash payment or a loan to a major league baseball club: Canteen, Restaurant Associates, Nilon Bros., Volume Service, Cleveland Concessions and Martin. The record shows two large loans were made by competitors of Sportservice. Both were made by large concessionaires new in the relevant market and who were struggling to enter. Both concerns were managed by former Sportservice employees and neither ·of them has repeated the performance. On the other hand, Sportservice dominates the relevant market and continues to use pay-offs to maintain its position.

■ 6. *The Court finds* that, beginning soon after the end of World War II and continuing to this date, the policy of Sportservice and its specific intent was and is to restrain competition, attempt to monopolize and to monopolize the relevant market in concession services. To effectuate this purpose Sportservice and its affiliated corporations—including Emprise Corporation—have combined and conspired among themselves and others to use their economic resources to provide money, credit and financial accommodation to major league baseball clubs or their owners on condition that the latter enter into unreasonably long, exclusive contracts with Sportservice for concession services. It was part and parcel of such conspiracy that Sportservice Corporation guarantee the performance of some of the concession contracts, such as the contract involved here; extend loans such as the one to the Seattle Club and become a party to some concession contracts, such as St. Louis. Individuals, such as Bill Veeck, were extended personal loans to buy clubs as a quid pro quo for Sportservice subsidiaries to receive concession contracts. As a result

Sportservice has foreclosed a substantial share of the relevant market in violation of Sections 1 and 2 of the Sherman Act. Tampa Electric Company v. Nashville Coal Company, 365 U.S. 320, 329, 81 S. Ct. 623, 5 L.Ed.2d 580 (1961).

 7. In the ultimate this case is about the 1950 Philadelphia Athletics contract as described in *Section 4(7)*, *supra*. The court finds the term of this contract unreasonably long in its original form and highly anti-competitive upon the addition of the ten and eight-year provisions (totalling 33 years); that the "follow the franchise" provision was and is unique and together with the term unreasonably restrains trade and was used in an attempt to monopolize and to monopolize a substantial segment of the relevant market.

Sportservice seeks to excuse its conduct by comparison with the Stevens N. Y. Giant contract. This is not a legal defense in any event. However, on the facts, the two situations are in no wise comparable in term, conditions, automatic extensions or club coverage (the 1950 Philadelphia contract covered two clubs in the same park).

8. *The Court finds* that at the time of the making of the 1950 Philadelphia Athletics contract described in *Section 4(7)*, *supra*, the Athletics had exhausted its borrowing power with financial institutions, its franchise was in serious financial trouble and, by 1952, had so worsened that "the Philadelphia Athletics would have been left to die—no one daring to inject it with the financial transfusion which it so desperately needed." Sportservice brief.

9. *The "Tie-In" Violation Under Fortner v. United States:*

 Finley also claims that Sportservice has tied the sale of credit and financial arrangements to the sale of concession services in violation of the doctrine of Fortner v. United States, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). It is not necessary to pass upon this question since we find other viola-

tions of both Sections 1 and 2 of the Act that are not *per se* illegalities, as is a *Fortner* situation.

Sportservice has a novel theory on which it seeks to escape this *per se* violation. It says that the sale of the concession service is a franchise made by the team as seller and is paid for by the concessionaire as buyer through a "two part price structure." The cash payments, loans, et cetera, are the first part and the percentage on gross sales the second one. The Court is of the opinion that the concessionaire is the seller and the tied product is the concession service while the tying product is the cash payments, advances, loans, et cetera, both going from the concessionaire to the club; in consideration of this the concessionaire gets the exclusive concession contract which gives him the right to perform the services and receive his per cent of the gross sales.

Sportservice does not agree, claiming that the loans, irrespective of their interest rate, are gifts or "payment in kind." If this is true, then "credit" could never be a tying product and *Fortner* is wrong. Not being able to assume that, at least while sitting here, the Court cannot agree. Nor are the services of the concessionaire rendered to the spectator in the ball park as Sportservice claims. The service is purchased by the club from Sportservice and Sportservice is acting for the club in selling the hot dog to the Club's guest. Hence, the Court finds that the club is the purchaser and the concessionaire the seller of the services. Louis Jacobs himself said that Sportservice renders a service to the clubs it serves. Jerry Jacobs, presently President of Sportservice and son of Louis, says:

> "Well, actually, our policy is to give service to our customers. And embodied in that might be advances or loans, depending on their requirements, at their request."

Even trial counsel for Sportservice answered the inquiry of the Court as to whether Sportservice rendered a service: "Just like everybody else, Your Honor

. . . Everybody provides a service in that we do something they don't have to do." Official after official of concessionaires said that they "provide a service." And stadium managers and operators said the concession is "an agreement of service . . . a very simple relationship of services provided for money . . ." (Liegler of Anaheim). The Montreal Club official said the team "is purchasing management and the concessionaire is providing a service to the ball club." In public bidding, the specifications are sent out to the concessionaires who sell the type of service called for by bidding or making an offer to sell services which is accepted or rejected. Moreover, the club maintains some controls over the service, i. e., the quality of food, efficiency, hours of work, number of stands and type, prices charged, et cetera. These vary from concession to concession. It seems clear that what the club is purchasing is service or management, in order to be relieved of the chore of handling its own concessions. Rather than considering what function is performed, Sportservice looks at "who pays whom." This emphasis is unrealistic. It is true that the concessionaire collects for the hot dog and sends the club its percent. But this is unimportant. The concessionaire is merely a conduit between the purchaser of the hot dog and the club; the latter's percent attaches the minute the hot dog is sold.

There remains the question of whether Sportservice has sufficient market power to make its financial arrangements serve as an effective lever. This is a question of fact and the Court finds that Sportservice has sufficient power and that the amount of commerce affected is not "insubstantial." In each instance, at the time of the making of the contract (whether it be Connie Mack's 1950 one in Philadelphia or the Montreal or Seattle one), the respective club had exhausted its credit. Sportservice was the only line of credit left to the club. As Mr. Ehlers of the Philadelphia Athletics testified (on the 1950 contract involved here):

"If it hadn't been for Sportservice advancing that money, the Macks would have been out of business and would have lost everything . . . Stevens (another concessionaire) wouldn't give us anything. But these people would give us this money to tide us over, to get us on our feet . . . We needed money."

In view of these circumstances the Court finds Sportservice guilty of a *per se* violation of Section 1 of the Sherman Act. This finding is merely cumulative of the previous ones.

### 10. *The 1950 Contract is Unenforceable.*

■ A motion was heretofore made by Sportservice to strike Finley's antitrust defense based on the principle that courts will not enforce illegal contracts. On May 1, 1968, Judge Peckham denied the motion. I take this ruling to be the law of the case. However, in an abundance of precaution, the Court notes his agreement with Judge Peckham.

As early as 1909 in Continental Wall Paper Co. v. Louis Voight & Sons, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 the Court held that where enforcement of a contract would give direct sanction to an illegal restraint under the Sherman Act the Court would not permit it. Here Sportservice seeks to enforce the unexecuted portion of an illegal agreement. Sportservice makes no contention that Finley has failed to meet any of its obligations under the contract prior to the commencement of this action.

A failure to recognize this long established defense would serve to frustrate the Sherman Act and render it impotent. The Courts will not lend their processes to such a purpose. The contract involved has already enjoyed a tenure of 17 years and would run for 16 additional years if this defense is stricken here. Sportservice cites Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475

(1959), as contrary. The Court finds it inapposite. There a contract for the sale of onions had been completely performed, save for the payment. Justice Holmes, in his usual pungent style, articulated the overriding general policy of "preventing people from getting other people's property for nothing when they purport to be buying it." 212 U.S. 271, 29 S.Ct. 296. That policy controlled the *Kelly* case. No such policy is involved here. Indeed the shoe is on the other foot.

■ Nor is Sportservice afforded any defense by reason of its claims that some of the contracts involved in its acquisitions were entered into with a public or governmental body or as a result of competitive bidding and, therefore, are exempted from the antitrust laws. The law is to the contrary. See Hecht v. Pro-Football, Inc., 144 U.S.App.D.C. 56, 444 F.2d 931 (1971).

## 11. DAMAGES:

■ Finley is entitled to recover its damages, the measure of which is the difference between what it would have received had there been no illegal restraints and what is actually received under the 1950 contract. The damage period is four years which narrows our measurement to the four baseball seasons 1964 to 1967, both inclusive.

It is always difficult to assess damages in an antitrust suit. However the problem here is not so difficult as in other cases where comparisons are not available. Here we have major league baseball contracts as well as bids that are helpful in our determination. The 1960 contracts in Cleveland and Washington, D. C., both Sportservice, each paid a 33 percent return; and in 1963 the Sportservice St. Louis contract carried the same figure. The Oakland bid of Volume Service in 1965 carried 35 percent, while Atlanta in 1965 with a $2,600,000 loan from ARA drew 39 percent plus a profit-sharing arrangement. In 1966 Cincinnati received 35 percent from Sportservice. In 1967 ARA gave the Connie Mack Stadium in Philadel-

phia 37 percent. It is the same park in which the 1950 contract allowed the Athletics 29 percent. In 1969 Montreal drew 33⅓ percent, Seattle 32 percent and Cincinnati 33.2 percent, all with Sportservice. In 1968 Kansas City—the same park involved here—had four bids ranging from 33 percent to 38 percent. B & L, which is 50 percent Sportservice owned, bid 33.2 percent with a $401,000 annual guarantee, while Ogden bid 33 percent with an annual guarantee of $236,000. Ogden was awarded the contract. The Court has considered all of the statistics and arguments of the parties and finds that the acts of Sportservice were the proximate cause of the injury to Finley and fixes the damages at $282,168.00 for the four year damage period. This amount will be trebled according to law. In addition Finley is entitled to reasonable attorneys fees which will be fixed by the Court.

12. The injunction heretofore issued will be dissolved.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. The counter—defendants have violated both Section 1 and Section 2 of the Sherman Act.

3. Counter—plaintiff has been proximately injured by the Counter Defendants' violation of the Sherman Act and is entitled to money damages in the amount of $282,168.00, to be trebeled according to law.

4. The contract of September 25, 1950, is unenforceable and Counter—plaintiff is entitled to no relief thereunder.

## FINAL JUDGMENT ORDER

This cause having been tried to the Court without a jury; the Court having heard the testimony, having read the documentary evidence and having considered the memoranda and arguments of the parties,

It is hereby ordered, adjudged and decreed as follows:

1. The order for preliminary injunction hereinbefore entered is hereby set aside and the preliminary injunction heretofore issued pursuant to said order is hereby dissolved.

2. The findings of fact and conclusions of law embodied in the Court's Amended Memorandum of Decision dated September 29, 1972 are hereby adopted and entered.

3. The contract claims of the Plaintiff-Counterdefendant Twin City Sportservice Inc. against the Defendant-Counterclaimant Charles O. Finley and Company, Inc. are denied on the affirmative defenses interposed by Defendant-Counterclaimant based on the federal antitrust laws as are set up in its answer; and Plaintiff-Counterdefendant's complaint is hereby dismissed with prejudice.

4. With respect to the issues tendered by the first amended counterclaim of Defendant-Counterclaimant Charles O. Finley and Company, Inc. hereinbefore filed and the answers thereto of the Plaintiff-Counterdefendants, Judgment is entered in favor of the Defendant-Counterclaimant Charles O. Finley and Company, Inc. and against the Plaintiff-Counterdefendants, Sportservice Corporation and Twin City Sportservice Inc. in the amount of $846,504, plus reasonable attorneys' fees and costs to be determined by subsequent order of the Court.

5. The amended second and third counterclaims filed by the Defendant-Counterclaimant Charles O. Finley and Company, Inc. are hereby dismissed.

6. In light of the delay on the determination of the reasonable attorneys' fees to be allowed in order to afford the Plaintiff-Counterdefendants time to have discovery they deem necessary thereto, the Court expressly determines that there is no just reason for further delay in the entry of this Judgment and directs that it be entered forthwith.