**TWIN CITY SPORTSERVICE, INC., a Missouri Corporation, and SPORT-SERVICE CORPORATION, a New York Corporation, Appellants,**

v.

**CHARLES O. FINLEY & COMPANY, INC., an Illinois Corporation, Appellee.**

**Nos. 73–1126, 73–1585.**

United States Court of Appeals, Ninth Circuit.

Feb. 21, 1975.

---

John P. Frank, of Lewis & Roca (argued), Phoenix, Ariz., for appellants.

William G. Myers, of Rothschild, Barry & Myers, Chicago, Ill. (argued), for appellee.

## OPINION

Before TRASK and SNEED, Circuit Judges, GRAY,* District Judge.

SNEED, Circuit Judge:

This is an appeal from a trial court judgment awarding treble damages, attorney's fees and costs to appellee-counterclaimant Charles O. Finley & Company, Inc. (Finley) on the ground that a 1950 contract between the then-owner of the Athletics baseball team and a predecessor in interest of appellant Twin City Sportservice, Inc. (Sportservice) violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Sportservice initiated the suit against Finley in 1967, alleging breach of contract by the latter, and seeking declaratory, injunctive, and monetary relief. Finley filed a counterclaim, charging antitrust violations, and joined Sportservice Corporation, the parent of Sportservice. Jurisdiction was based, in the contract action, upon 28 U.S.C. § 1332 and, on the antitrust claims, upon 15 U.S.C. §§ 15 and 22.

The dispute which culminated in this litigation finds its origins in a concession franchise contract signed September 25, 1950, the parties to which were Penn Sportservice, Inc. (Penn), a predecessor in interest of Sportservice, and the American League Baseball Club of Philadelphia (the then-owner of the Philadelphia Athletics baseball club), which in turn was owned by Connie Mack. The latter also owned Shibe Park (Connie Mack Stadium) where the Athletics' home games were played. At the time the contract was negotiated the Athletics had just concluded the baseball season with a losing record and were experiencing financial problems. On August 28, 1950 Mack had arranged to borrow $1,750,000 from the Connecticut General Life Insurance Company and in return gave a first mortgage on the stadium and agreed to assign his share of concession receipts as security.

The 1950 contract with Penn produced an additional source of revenue for the Athletics. By its terms Penn obtained a fifteen-year exclusive concession franchise for all events at Shibe Park, which was to be "unaffected by change of ownership" for whatever reason. For its part, Penn advanced the team the sum of $150,000 and agreed to pay them 29% of its gross concession receipts and 35%

---

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

of its advertising receipts, guaranteeing certain minimum payments. Penn also purchased the existing concession equipment at the stadium for $100,000, subject to an obligation on the part of the team to repurchase it for a like sum under certain conditions, and agreed to loan the Athletics an additional $100,000 in the future.

The contract was amended on July 1, 1952 to terminate any obligation of the team to repay the $100,000 equipment purchase price and in return the franchise was extended by ten years. In 1953, in order to secure a loan from Penn, the Athletics confirmed by letter that if the team should move, the concessionaire would "follow the franchise," i. e., the Sportservice franchise would continue both at Shibe Park and at any new location of the club.

The Athletics changed hands in 1954 and when Arnold Johnson, the new owner, moved the team to Kansas City shortly thereafter, Penn's concession franchise right travelled with it under the follow-the-franchise provision. Johnson also decided to sell Shibe Park to the Phillies ball club and in order to facilitate the transaction, arranged to reduce the remaining term of the Penn franchise at the stadium by eight years and in turn, to extend the duration of the concession agreement with the Athletics by the same period. At that time Penn assigned its franchise right under the contract—which now ran for 33 years— to Sportservice and the latter undertook the concessions operations in Kansas City.

In 1961 Charles O. Finley & Company acquired ownership of the Kansas City Athletics, and Sportservice continued its concessions operations through the end of the 1967 baseball season, when Finley moved the team to Oakland, California. Sportservice, on the basis of the follow-the-franchise provision, insisted that its concession franchise was not terminated by the move; Finley, however, countered that it was not bound by the 1950 agreement. In 1968 another concessionaire,

Volume Service Company, commenced operations at the Athletics' home games pursuant to a 1966 contract with Coliseum, Inc., the Oakland stadium authorities.

Sportservice filed suit, claiming that Finley is bound by the 1950 contract. Finley denied this and argued that the terms of the contract violated §§ 1 and 2 of the Sherman Act. The case was bifurcated into contract and antitrust segments and trial on the latter claim awaited resolution of the former. At the conclusion of trial on the contract issue the court found that "there was an understanding that the concession contract would follow the franchise prior to Finley's purchase of the Athletics or, in any event, that Finley had ratified such an understanding and was now estopped from denying it." Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 365 F.Supp. 235, 238 (N.D.Cal.1972). Thus Finley would be bound by the 1950 contract and liable to Sportservice for damages for breach unless it prevailed on the antitrust counterclaim in the subsequent trial. There, the court found that the counterdefendants had violated §§ 1 and 2 of the Sherman Act and that Finley had been proximately injured thereby in the amount of $282,168, to be trebled. This appeal followed. We reverse and remand for further proceedings.

We shall first discuss whether Finley's antitrust claims are barred by limitations. Next we shall discuss the trial court's holdings that Sportservice properly was guilty of actual monopolization and restraint of trade pursuant to Sections 2 and 1, respectively, of the Sherman Act. Thereafter we shall consider the trial court's conclusion, which it considered unnecessary to its judgment, that Sportservice engaged in a tying arrangement constituting a *per se* violation of § 1 of the Sherman Act. To conclude this opinion, we shall consider the trial court's holding that Sportservice, contrary to § 2 of the Sherman Act, attempted to monopolize. Throughout this

opinion, for convenience, all actions taken by Sportservice's predecessor in interest, Penn, are attributed to Sportservice.

## I.

### Limitations

[1, 2] Certain defenses to Finley's counterclaim were raised in the Sportservice brief that were not pressed upon the trial court. In view of our disposition of this case we feel it necessary to deal only with the assertion by Sportservice that Finley's treble damage action is barred under 15 U.S.C. § 15b, which provides that such actions are "forever barred unless commenced within four years after the cause of action accrued." A civil cause of action under the Sherman Act arises at each time the plaintiff's interest is invaded to his damage, and the statute of limitations begins to run at that time. Suckow Borax Mines Consol., Inc. v. Borax Consol., Ltd., 185 F.2d 196, 208 (9th Cir. 1950), cert. denied 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951). Sportservice argues that Finley's suit is barred because it was not filed within four years of the last allegedly damaging act, the amendment or extension of the contract to its complete 33-year duration in 1954. This argument overlooks the necessarily continuing nature of the alleged harm. As the Supreme Court stated in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968),

> "We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. [Citation omitted.] Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm . ."

Thus the fact that the final amendment to the contract was made in 1954 does not preclude Finley from bringing suit in 1968. To hold otherwise is to say that some damage that might have been sustained was barred before it accrued.

Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 732 (8th Cir. 1964).

## II.

### Actual Monopolization

■ ˙There are two prerequisites to a showing of actual monopolization under § 2 of the Sherman Act, "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449, 458 (9th Cir. 1966), rev'd on other grounds, 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967). If the first element is absent the analysis need proceed no further.

■ Monopoly power is the power to control prices or exclude competition. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (9th Cir.), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Since "size is of course an earmark of monopoly power," United States v. Griffith, 334 U.S. 100, 107 n. 10, 68 S.Ct. 941, 946, 92 L.Ed. 1236 (1948), the existence of such power ordinarily may be inferred from the predominant share of the market. United States v. Grinnell Corp., supra, 384 U.S. at 571, 86 S.Ct. 1698; Jack Winter, Inc. v. Koratron Co., Inc., 375 F.Supp. 1, 68 (N.D.Cal.1974).

■ Therefore, to determine whether a party has monopoly power it is essential first to define the "relevant market." Case-Swayne Co., supra, 369 F.2d at 454. Clearly, a determination of the relevant market is a necessary predicate to finding a violation of § 7 of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition "within the area of effective competition." Brown Shoe Co.

v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The area of effective competition is defined in terms of a product market and a geographic market. Brown Shoe, *supra,* 370 U.S. at 324, 82 S.Ct. at 1502; Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800, 804 (9th Cir. 1961), cert. denied 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962). The same inquiries regarding the relevant market must, therefore, be undertaken in actions charging violation of § 2 of the Sherman Act since there is "no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." United States v. Grinnell Corp., *supra,* 384 U.S. at 573, 86 S.Ct. at 1705; Case-Swayne Co., *supra,* 369 F.2d at 454.

In the present case, the lower court held, and it was not disputed on appeal, that the relevant geographic market is a national one. Controversy arises, however, in connection with the definition of the relevant product market. The Supreme Court has recognized that "[t]he 'market,' as most concepts in law or economics, cannot be measured by metes and bounds . . .. For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range." Times Picayune Publishing Co. v. United States, 345 U.S. 594, 611, 612 n. 31, 73 S.Ct. 872, 881, 882, 97 L.Ed. 1277 (1953). Nor, however, is it proper to read the Sherman Act "to require that products be fungible to be considered in the relevant market." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956). Therefore, "[i]n defining the product market between these terminal extremes, we must recognize meaningful competition where it is found to exist." United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964).

The proper point of departure in any discussion of the relevant product market must be the rule of "reasonable interchangeability," enunciated in United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). According to the Court,

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of trade or commerce", monopolization of which may be illegal.

That is, where there is a high degree of *substitutability in the use* of two commodities, it may be said that the cross-elasticity of demand between them is relatively high, and therefore the two should be considered in the same market.

A like analysis applies when the market is viewed from the production rather than the consumption standpoint; the degree of substitutability in production is measured by cross-elasticity of supply. Substitutability in production refers to the ability of firms in a given line of commerce to turn their productive facilities toward the production of commodities in another line because of similarities in technology between them. Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market. While the majority of the decided cases in which the rule of reasonable interchangeability is employed deal with the "use" side of the market, the courts have not been unaware of the importance of substitutability on the "production" side as well. Brown Shoe Co. v. United States, 370 U.S. 294, 325 n. 42, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. Columbia Steel Co., 334 U.S. 495, 510–11, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

With these principles in mind, we turn to the district court's definition of the relevant market. Its definition is founded on the premise that the concessionaire is the seller of concession

services and that the purchaser of these services is the baseball team or stadium owner. From this premise it derived the conclusion that the sale of concession services to major league baseball was the relevant market. In reaching this conclusion it relied heavily upon its characterization of major league concession contracts as uniquely desirable contracts from the standpoint of a concessionaire. The district court observed, "There is no evidence of any willingness of a concessionaire to trade a major league baseball concession for any other or for a cluster of others; nor is there evidence of a club owner trading his share for a non-baseball concession share." Twin City Sportservice, *supra,* 365 F.Supp. at 245. In addition, the trial court found that the per team annual spectator attendance is larger for major league baseball than for any other sport and that it enjoys the highest per capita concession revenues and produces the highest total concession revenues and profits of all sports. *Id.* at 242. We cannot accept this definition of the relevant market.[1]

We begin by pointing out that a concessionaire sells hot dogs, beer, and other concession items to spectators at various types of events. The market in which the concessionaire sells is the concession products market. Payment for these products is made by the spectators to the concessionaire. The authority to enter the concession products market in a particular place, manner, and time is obtained by the concessionaire from the ball team or stadium owner. This authority constitutes a franchise. In exchange for obtaining a franchise the concessionaire undertakes to make certain payments to the grantor of the franchise, at least a portion of which payments generally are

determined by reference to the gross receipts of the concessionaire.

These facts lead us to conclude that the trial court erred in treating Sportservice as a seller of concession services to major league baseball teams. Such services are sold to spectators who directly and immediately pay therefor—not to the major league baseball teams. The relationship between the major league baseball team or stadium owner and the concessionaire is one in which a *franchise* is sold by the ball team or stadium owner to the purchasing concessionaire. The market in which the franchise is sold is the franchise market—a market quite distinct from the concession products market. It follows that the relevant market with which we are concerned here is one in which the articles of commerce are franchises, not concession services. Ample testimony to support this conclusion of law was offered in the proceedings below.

We must hold, therefore, that the district court erred in its designation of the relevant market. We do not believe, however, that the present record permits us to fix the relevant franchise market. At trial, Sportservice argued that the relevant market should be defined in terms of "the exchange of concession franchises, for the sale of a limited menu of concession items, to spectators in a closed area, either by vendors, by stands or both, where the preparation requires at most a grill and not a kitchen." So defined the market would encompass franchises at 1,250 arena-auditoriums, 850 stadiums, 623 horse racing tracks, and 35 dog racing tracks. Sportservice on appeal appears to have narrowed its definition to include only major sports stadiums and arenas. In view of the

---

1. Even if we agreed with the trial court's basic premise, that the provision of concession services to major league baseball was the relevant market, its failure to include as participants in that market baseball clubs which supply their own concessions very likely would compel reversal on that ground. The considerations which, in the view of the trial court, make the opportunity to provide concession services to a major league base-

ball club a uniquely desirable and profitable one in the eyes of a professional concessionaire must also appeal to the stadium or team owner-cum-entrepreneur. Thus, the exclusion from the relevant market of baseball teams which run their own concessions operations—a pro-competitive influence in that market—could not be supported even under the trial court's conceptualization.

fact that the district court erroneously focused its attention on the sale of concession services, the present record does not enable us to determine the precise outlines of the relevant franchise market. We must, therefore, remand this case to the district court to determine the scope of the relevant franchise market.

In determining the proper relevant franchise market the district court should be guided by the following observations. We have already indicated that a concessionaire is a buyer in the franchise market and a seller in the concession products market. The willingness of a concessionaire to bid for a concession franchise depends upon his ability to move from selling concession items to spectators at one type of event or facility to those at the event or facility for which the franchise is offered. Only when his resources easily can be devoted to the concession products market for which the franchise is offered can the concessionaire make effective use of the franchise. Put in the technical terms of antitrust law, the cross-elasticity of supply in the concession products market limits the cross-elasticity of demand in the franchise market.

The evidence before the trial court strongly suggests that there is a high degree of "substitutability in production." That is, the evidence was sufficient to support a finding that many aspects of the concession operations at the various facilities presenting leisure time events other than major league baseball are the same or similar enough to each other and to those existing at major league baseball parks to be considered substitutable or transferable. Moreover, some concessionaires utilize the same employees, stands and equipment to sell concession items at different events in a given facility and, at the higher managerial level, also employ the same purchasing agents and supervisorial personnel. There exists evidence of inter-facility transferability as well. Stadium and ball club owners testified that in choosing a concessionaire, previous baseball

experience is not a *sine qua non* for selection. It is only necessary that the prospective concessionaire have engaged in a concession operation of a comparable magnitude so as to demonstrate an ability to perform satisfactorily.

It follows that the relevant franchise market cannot be limited to those offered for sale by major league baseball teams. The mere fact that, as the trial court found, major league baseball, because of its long season, frequency of games, and pace of play, produces the highest total concession revenues and profits of all sports does not alter this conclusion. The major league baseball team concession is a coveted franchise for this reason and, as a consequence, commands a high price on the franchise market. There are, however, other leisure time activities that offer for sale other concession franchises for which there are bids by concessionaires capable of serving both that for which they bid as well as major league baseball.

The authorities involving "submarkets" cited by the trial court to support its conclusion of law that the sale of concession services to major league baseball teams constituted the relevant "submarket" or "part" of commerce included International Boxing Club v. United States, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959) (promotion of championship boxing contests); United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (automobile finishes and fabrics); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948) (rolled steel); United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (first run movies); Fashion Originators Guild v. F. T. C., 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (original design dresses). These cases are inapposite. Each involved the issue whether a seller of a unique property in the relevant submarket had violated the antitrust laws. Were the issue before us whether major league baseball, in whole or in part, constituted an illegal monopoly, these cases

would be in point. The focus of our attention is different, however. It is upon the buyer of concession franchises from major league baseball teams as well as other vendors who offer other sporting events or who operate stadia and arenas. To determine the relevant market in which this buyer operates we must, as already indicated, examine the cross-elasticity of supply in the concession products market.

Moreover, the scope of the relevant market is not governed by the presence of a price differential between competing products. In *du Pont,* for example, the Supreme Court included cellophane in the flexible wrapping market, along with glassine and grease-proof papers, its chief competitors, despite the fact that its cost was two or three times as great. 351 U.S. at 401, 76 S.Ct. at 994.

The relevant franchise market, however, does not embrace franchises offered in connection with leisure time activities that require the maintenance of a full kitchen. The requisite substitutability in production is lacking in this instance. The franchise market with which the trial court should be concerned on remand of this case is that which envisions the sale by the concessionaire of a limited range of concession items to spectators in a closed area, either by vendors, stands, or both, where the preparation requires at most a grill and not a kitchen. The leisure time activities with respect to which franchises within the relevant market are available are undoubtedly numerous. They may include all or a substantial number of the following: *viz.,* football, basketball, hockey, soccer, boxing, racing, track and field, rodeos, circuses, and music festivals. Likewise the sellers of such franchises may include professional teams, sports organizations, and public and private operators of stadiums, arenas, race tracks, convention centers and amusement parks.

We conclude these guides to the trial court by observing that in establishing the relevant franchise market the trial court (1) should apply the test of reason-able interchangeability and (2) should treat the leisure time activity or facility manager as the seller of the franchise and the concessionaire as the purchaser.

Our decision to remand this case makes it unnecessary to determine whether a 50% share of a major league baseball concession market amounts to a sufficient showing of monopoly power. We do, however, wish to remind the trial court when considering this case on remand of Judge Learned Hand's famous dictum that while 90% of the market "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not." United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir. 1945). It also should be recalled that on several occasions courts have considered a 50% share of the market as inadequate to establish a proscribed monopoly. *See* Continental Baking Co. v. Old Homestead Bread Co., 476 F.2d 97, 104 (10th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973); Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207 (5th Cir. 1969); Jack Winter, Inc. v. Koratron Co., Inc., 375 F.Supp. 1, 68 (N.D.Cal.1974); United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 346 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

III.

*Restraint of Trade*

Our reversal and remand to determine the relevant franchise market also requires that we reverse and remand the trial court's finding that the 1950's contract between Sportservice and the Athletics was "unreasonably long in its original form and highly anti-competitive upon the addition of the ten and eight-year provisions . . ." Twin City Sportservice, *supra,* 365 F.Supp. at 253. This is required because it is necessary to establish the proper relevant market before it can be determined whether a particular exclusive-dealing arrangement unreasonably restrained competition in a substantial share of

that market. This determination is necessary by reason of the application of the teaching of Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), a § 3 of the Clayton Act case, to § 1 of the Sherman Act.

The test announced in *Tampa Electric* is as follows: "In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section [§ 3, Clayton Act] unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Id.* at 327, 81 S.Ct. at 628. These parties appear to agree that this test provides an appropriate guide. To apply this test it is necessary to determine (1) the line of commerce affected, (2) "the area of effective competition" in this line of commerce, and (3) whether the competition foreclosed constitutes a substantial share of that within "the area of effective competition." Inasmuch as "the area of effective competition" is the relevant market, *id.* at 328, 81 S.Ct. at 623, it follows that application of the *Tampa Electric* test under § 1 of the Sherman Act requires a proper determination of the relevant franchise market. Since this has not been done there is no need for us to comment further on whether the facts of this case meet the test.

Nonetheless, we should not close this discussion without making two observations. The first is that a greater showing of anti-competitive effect is required to establish a Sherman Act violation than a § 3 Clayton Act violation in exclusive-dealing or requirements contracts cases. *See* E. Kintner, An Antitrust Primer, 58 (2d ed. 1973). The existence of this heavier burden is rooted in the language of the two statutes; the Sherman Act speaks of actual restraints of trade while § 3 of the Clayton Act speaks of effects of arrangements which may substantially lessen competition or tend to create a monopoly. The heavier burden required by the Sherman Act was recognized in connection with "ty-

ing" cases in Times Picayune v. United States, 345 U.S. 594, 608–9, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). *See also,* Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1960); Curly's Dairy, Inc. v. Dairy Cooperative Ass'n, 202 F.Supp. 481, 485 (D.Or. 1962).

■■■ Our second comment relates to the follow-the-franchise provision in the Sportservice-Athletics agreement which the trial court found acted as a restraint of trade as well as a mechanism to enforce the long term contract. We are inclined to doubt that this provision has independent anti-competitive effects apart from those springing from the length of the contract. Our doubt rests on the belief that in these days of highly mobile professional sports franchises follow-the-franchise provisions are needed even when the duration of the concession franchise is relatively short.

## IV.

### *Tying*

Our decision to reverse and remand the judgment of the trial court for the purpose of fixing the relevant franchise market makes it necessary that we consider the trial court's conclusion that Sportservice is guilty of a *per se* violation of § 1 of the Sherman Act under the reasoning of Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

*Fortner* held that to offer loans on favorable terms on condition that the borrower purchase prefabricated houses constituted "a tying arrangement of the traditional kind," 394 U.S. at 498, 89 S.Ct. at 1256. Such an arrangement is illegal *per se* "whenever a party [the lender-seller] has sufficient economic power with respect to the tying product [the loan] to appreciably restrain free competition in the market for the tied product [prefabricated houses] and a 'not insubstantial' amount of interstate commerce is affected." *Id.* at 499, 89 S.Ct. at 1256, citing Northern Pacific Ry. Co.

v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Here the trial court characterized the advances made by Sportservice to the Athletics as the tying product and its concession services as the tied product and concluded that there was an appreciable restraint on free competition and that a not insubstantial amount of interstate commerce was affected.

 Our holding with respect to the relevant franchise market dictates our disapproval of this conclusion of the trial court. We view Sportservice as a purchaser of a concession franchise from the Athletics, the seller, in exchange for payments consisting of (1) certain loans and advances and (2) a percentage of gross receipts, payable throughout the life of the contract. Viewed in this manner, the *sine qua non* of a tying case, *viz.* two separate products, is lacking. *See* Siegel v. Chicken Delight, Inc., 448 F.2d 43, 47 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). The cash, advances, and percentage of the gross receipts constitute the means by which Sportservice is to pay the purchase price of the franchise. The only product involved is the franchise. A loan on favorable terms in connection with a purchase of a commodity by the lender is simply a means by which the lender meets his purchase money obligation. This is true without regard to the type of commodity purchased. The favorable aspect of the loan undoubtedly would not have been agreed to by the purchaser had he not wished to acquire the commodity the seller-borrower is offering for sale. The seller-borrower's monopoly power may induce such a loan; but that does not warrant the transformation of the purchaser-lender into a seller of two commodities, cash payments and a favorable loan, for the purpose of charging such purchaser-lender with Sherman Act violations.

The absence of two separate products, the presence of which must exist in order to justify invoking *Fortner,* 394 U.S. at 507, 89 S.Ct. at 1252, makes it unnecessary for us to review the trial court's findings that Sportservice had sufficient economic power in the market for the tying product, credit, and that the amount of commerce affected in the tied product, concession services, was not insubstantial. We merely wish to point out that the trial court's determination that the Athletics "had exhausted its credit," 365 F.Supp. at 254, alone cannot support such findings. The near insolvency of the Athletics in the early 1950's and Sportservice's loan to it does not establish the requisite market power.

## V.

### *Attempt to Monopolize*

 The trial court's finding that Sportservice is guilty of an attempt to monopolize under § 2 of the Sherman Act must also be reversed. Although it is well established in this circuit that the "probability of actual monopolization" is not an essential element of proof of intent to monopolize, Lessig v. Tidewater Oil Co., 327 F.2d 459, 474 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), it is also clear that evidence of market power is relevant but "not indispensable where a substantial claim of restraint of trade is made." Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8, 12–13 (9th Cir. 1974). In view of our rejection of the trial court's characterization of the relevant market and the necessity on remand to consider concession franchises other than those offered by major league baseball teams, it is not possible for us to conclude under the present state of the record that a "substantial claim of restraint of trade" has been made. In due course such a claim may be made. Under present circumstances, however, such a claim could be said to exist only if we were prepared to accept the trial court's determination that the relevant market is concession services furnished to major league baseball teams. This we cannot do. We reverse the trial court's finding with respect to an attempt to monopolize and remand for further proceedings.

Reversed and remanded.