A&A DISPOSAL AND RECYCLING, INC., Plaintiff-Appellee and Cross-Appellant, v. BROWNING-FERRIS INDUSTRIES OF ILLINOIS, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Second District No. 2—95—0534

Opinion filed April 17, 1996.—Rehearing denied May 17, 1996.

Michael A. Pollard, Thomas A. Doyle, Donald J. Hayden, and Barrie L. Brejcha, all of Baker & McKenzie, of Chicago, for appellants.

Edward L. Foote, of Winston & Strawn, of Chicago, and Robert M. Foote, Timothy D. O'Neil, and Craig S. Mielke, all of Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora, for appellee.

JUSTICE GEIGER delivered the opinion of the court:

The defendants, Browning-Ferris Industries of Illinois, Inc. (BFI of Illinois), Browning-Ferris Industries (BFI), and Rot's Disposal, Inc. (Rot's), appeal from the judgment of the circuit court of Kane County awarding damages and attorney fees to the plaintiff, A&A Disposal and Recycling, Inc., on its claim under the Illinois Antitrust Act (740 ILCS 10/1 *et seq.* (West 1994)). The defendants raise numerous arguments on appeal. For the reasons discussed below, we reverse the judgment of the circuit court.

The plaintiff was a waste hauler that provided services in Du Page and Kane Counties until it sold its business to Groot Industries in 1989. The plaintiff filed this action under the Illinois Antitrust Act (740 ILCS 10/1 *et seq.* (West 1994)), claiming that it was forced to sell its business at a distress price because the defendants had offered predatory prices to Naperville customers.

Rot's and BFI of Illinois counterclaimed against the plaintiff, claiming that the plaintiff had conspired with other waste-hauling competitors to illegally allocate territories and thereby maintain monopoly power in Naperville. The court directed a verdict on the counterclaim in favor of the plaintiff.

The trial court denied the defendants' motions for summary judgment as well as the defendants' motion for reconsideration. The trial court also denied the defendants' motions for directed verdict, both at the close of the plaintiff's case and at the close of the evidence.

The jury returned a verdict against all three of the defendants, awarding the plaintiff $2.784 million in monetary damages. The trial

court used a multiplier of 1.5 to increase the damage award to $4.176 million. The trial court awarded $375,000 in attorney fees to the plaintiff. The trial court denied the defendants' motion for judgment *non obstante veredicto* or for a new trial and awarded the plaintiff $68,985.25 in additional attorney fees for the post-trial proceedings. The defendants filed a timely notice of appeal.

■ The defendants' first argument on appeal is that the trial court improperly failed to direct a verdict or enter judgment *n.o.v.* in their favor. The defendants argue that the plaintiff failed to satisfy its burden by limiting its definition of the relevant product market to only those services rendered to commercial customers, when the same productive assets, trucks, and drivers are interchangeably used for both commercial and residential customers. A trial court should not direct a verdict or enter a judgment *n.o.v.* unless all of the evidence, when viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). That standard also governs our consideration of a trial court's denial of such a judgment. *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 380 (1993). Where this court is called upon to review a trial court's denial of a motion for judgment *n.o.v.*, we have no license to substitute our judgment for that of the jury. *Morse v. Johnson*, 81 Ill. App. 3d 552, 555 (1980). The jury's resolution of disputed factual questions and the jury's determination as to which witness' recollection is more reliable can only be set aside where palpably erroneous or wholly unwarranted. *Morse*, 81 Ill. App. 3d at 555.

■ This action was brought under section 3 of the Illinois Antitrust Act, which provides, in pertinent part:

"Every person shall be deemed to have committed a violation of this Act who shall:

\* \* \*

(3) Establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce." 740 ILCS 10/3 (West 1994).

Similarly, section 2 of the Sherman Anti-Trust Act provides in pertinent part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony \*\*\*." 15 U.S.C.A. § 2 (West Supp. 1995).

Because section 3 of the Illinois Antitrust Act is comparable to section 2 of the Sherman Anti-Trust Act, we look to federal law interpreting section 2 of the Sherman Anti-Trust Act for guidance in interpreting section 3 of the Illinois Antitrust Act.

■ The Supreme Court has articulated a two-part test for determining if a defendant has monopolized in violation of section 2 of the Sherman Anti-Trust Act. The plaintiff must first show that the defendant possessed monopoly power in the relevant market and then must demonstrate the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 786, 86 S. Ct. 1698, 1704 (1966).

To establish that the defendants have the market power required for monopolization liability, the plaintiff has to establish that the defendants have " 'a dominant market share in a well-defined relevant market.' " *Morgenstern v. Wilson*, 29 F.3d 1291, 1295-96 (8th Cir. 1994), quoting *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 318 (8th Cir. 1986). "The 'relevant market' is defined in terms of both product market *** and geographic market." *Morgenstern*, 29 F.3d at 1296. A monopolization claim often succeeds or fails strictly on the definition of the product or geographic market. *Morgenstern*, 29 F.3d at 1296. The plaintiff has the burden of describing a well-defined relevant market, both geographically and by product, which the defendants monopolized. *H.J., Inc. v. International Telephone & Telegraph Corp.*, 867 F.2d 1531, 1537 (8th Cir. 1989). The definition of a relevant market is essentially a question of fact, "turning on the unique market situation of each case." *H.J.*, 867 F.2d at 1537.

The Supreme Court has recognized that "[t]he 'market,' as most concepts in law or economics, cannot be measured by metes and bounds." *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611, 97 L. Ed. 1277, 1291, 73 S. Ct. 872, 881 (1953). "For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range." *Times-Picayune*, 345 U.S. at 612 n.31, 97 L. Ed. at 1292 n.31, 73 S. Ct. at 882 n.31. Nor, however, is it proper to read the Sherman Anti-Trust Act "to require that products be fungible to be considered in the relevant market." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394, 100 L. Ed. 1264, 1280, 76 S. Ct. 994, 1006 (1956). In defining the product market between these extremes, we must recognize meaningful competition where it is found to exist. *United States v. Continental Can Co.*, 378 U.S. 441, 449, 12 L. Ed. 2d 953, 960, 84 S. Ct. 1738, 1743 (1964).

■ The proper point of departure in any discussion of the rele-

vant product market must be the rule of "reasonable interchange-ability," enunciated in *E.I. du Pont de Nemours*, 351 U.S. at 395, 100 L. Ed. at 1280-81, 76 S. Ct. at 1007:

"In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal."

In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th Cir. 1975), the court explained:

"[W]here there is a high degree of substitutability in the use of two commodities, it may be said that the cross-elasticity of demand between them is relatively high, and therefore the two should be considered in the same market.

A like analysis applies when the market is viewed from the production rather than the consumption standpoint; the degree of substitutability in production is measured by cross-elasticity of supply. Substitutability in production refers to the ability of firms in a given line of commerce to turn their productive facilities toward the production of commodities in another line because of similarities in technology between them. Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market. While the majority of the decided cases in which the rule of reasonable interchange-ability is employed deal with the 'use' side of the market, the courts have not been unaware of the importance of substitut-ability on the 'production' side as well. [Citations.]" (Emphasis omitted.)

For example, in *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1429 (9th Cir. 1995), the plaintiffs argued that the defendant engaged in predatory pricing by selling self-serve, cash-only gasoline below marginal cost. The plaintiffs claimed that the alleged preda-tory pricing was an attempt by the defendant to monopolize the mar-ket, in violation of section 2 of the Sherman Anti-Trust Act. *Rebel Oil*, 51 F.3d at 1429. The plaintiffs argued that the relevant market included all retail sales of gasoline in Las Vegas, except for sales of full-serve gasoline. *Rebel Oil*, 51 F.3d at 1434. The defendant argued that the market was broader, consisting of all sales of retail gasoline in Las Vegas, including full-service gasoline. *Rebel Oil*, 51 F.3d at 1435. The district court granted summary judgment in favor of the defendant, concluding that the defendant did not possess enough power in the market to allow the predatory scheme to succeed. *Rebel Oil*, 51 F.3d at 1429-30. The district court concluded that both self-

serve, cash-only gasoline, and full-serve gasoline should be included in the relevant market. *Rebel Oil*, 51 F.3d at 1435.

On appeal, the *Rebel Oil* court stated:

> "Our independent review of [the plaintiffs'] expert affidavits compels the conclusion that it would be unreasonable for a juror to infer from those affidavits that full-serve sales of gasoline should be excluded from the relevant market. [The plaintiffs'] expert relied on 'demand elasticity'—that is, whether a price rise in self-serve, cash-only gasoline would cause self-serve consumers to shift their demand to full-serve gasoline. A price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium. [Citations.] But defining a market on the basis of demand considerations alone is erroneous. [Citations.] A reasonable market definition must also be based on 'supply elasticity.' [Citations.] Supply elasticity measures the responsiveness of producers to price increases. [Citation.] If producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market. [Citation.] The affidavit of [the plaintiffs'] expert fails to account for the fact that sellers of full-serve gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by [the defendant] to charge supracompetitive prices for self-serve gasoline. The ease by which marketers can convert their full-serve facilities to increase their output of self-serve gasoline requires that full-serve sales be part of the relevant market; it is immaterial that consumers do not regard the products as substitutes, that a price differential exists, or that the prices are not closely correlated. [Citation.]" *Rebel Oil*, 51 F.3d at 1436.

In the present case, the plaintiff argues that the relevant product market is commercial end-loader service, which excludes services to residential customers. The plaintiff argues that services to residential customers should be excluded from the product market, primarily because if the price of the end-loader service drops materially, it will not add any residential customers. Similarly, if the price of the residential services increases, it will not add any commercial customers. There is no relationship between the prices in residential compared to commercial end-loader service.

Further, the plaintiff emphasizes that the industry recognizes the different types of service. Rot's maintains its business records to establish the profitability of each of these businesses separately. Categories are broken down into 004-roll-off, 005-rear loader commercial, 006-rear loader residential, and 009-front loader.

The plaintiff's expert, Dr. Mueller, testified that the commercial waste business was a separate market; the product can be priced without significant consideration for the price of other products. His opinion was based upon the type of contracts, the type of records kept, and the fact that firms do not take into account residential or roll-off prices when setting the price of the commercial end-loader service. Indeed, Dr. Mueller testified that there is no substitution for the commercial waste service.

The defendants dispute the plaintiff's narrow market definition. The defendants contend that the market is broader, consisting of both commercial end-loader service and residential service. We agree.

As the defendants point out, the same trucks and drivers can and do collect garbage from both residential and commercial customers on the same routes. The same trucks sometimes collect on primarily residential routes in the morning and primarily commercial routes in the afternoon, or vice versa. The plaintiff's own witnesses, including its expert, Dr. Mueller, testified that the same productive assets (trucks and drivers) can be used to pick up the waste for both commercial and residential customers, on the same routes, to be transported to the same landfills to be dumped at one set price. These shared assets can easily and expediently be diverted between residential and commercial customers without significant cost or delay. Joe DeVries, an owner of the plaintiff, testified that the plaintiff used the same trucks it bought to service Bolingbrook's residential contract to collect waste from commercial customers and obtained 30% of the commercial customers in Bolingbrook by doing so. Similarly, when Rot's won the right to haul all waste in Clarendon Hills, it used the same trucks and routes to collect both commercial and residential garbage.

We are aware that the plaintiff's expert testified that in his opinion commercial end-loader service was the relevant product market. But this does not alter our analysis. As the Supreme Court explained:

> "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. [Citation.] Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in *Matsushita*, 'expert opinion ... evidence has little probative value in comparison with the economic factors' that may dictate a particular conclusion." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242, 125 L. Ed. 2d 168, 198, 113 S. Ct. 2578, 2598 (1993), quoting

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 n.19, 89 L. Ed. 2d 538, 557 n.19, 106 S. Ct. 1348, 1360 n.19 (1986). The question is whether the inference to be drawn from the expert's opinion is " 'reasonable given the substantive law which is the foundation for the claim or defense.' " *Rebel. Oil,* 51 F.3d at 1436, quoting *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir. 1987).

█ In the present case, the undisputed facts indicate that the productive assets (trucks and drivers) can be, and are in fact, used for both commercial and residential service. Therefore, both categories of service should have been included in the relevant product market. See *Rebel Oil,* 51 F.3d at 1436; *Twin City Sportservice,* 512 F.2d at 1271. Since the plaintiff had the burden of proving the relevant product market (see *H.J.,* 867 F.2d at 1537), and since the plaintiff failed to meet that burden, we conclude that no reasonable jury could have found that the plaintiff had proved that the defendants had monopoly power in a well-defined relevant market (see *Morgenstern,* 29 F.3d at 1295-96). Therefore, the trial court should have directed a verdict or entered judgment *n.o.v.* for the defendants. See *Pedrick,* 37 Ill. 2d at 510. As our resolution of this issue is dispositive of this appeal, we need not address the defendants' other arguments.

The judgment of the circuit court of Kane County is reversed.

Reversed.

McLAREN, P.J., and INGLIS, J., concur.